MICHAEL C. TU (State Bar No. 186793)
*mtu@orrick.com*
KEVIN M. ASKEW (State Bar No. 238866)
*kaskew@orrick.com*
MICHELLE VAN OPPEN (State Bar No. 293509)
*mvanoppen@orrick.com*
ORRICK, HERRINGTON & SUTCLIFFE LLP
777 South Figueroa Street, Suite 3200
Los Angeles, California 90017
Telephone:   (213) 629-2020
Facsimile:   (213) 612-2499

Attorneys for Defendants
Appliance Recycling Centers of America, Inc.,
Edward R. Cameron and Jeffrey A. Cammerrer

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| JASON FEOLA, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>EDWARD R. CAMERON, et al.,<br><br>Defendants. | Case No. 15-cv-1654 JAK (AJWx)<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' AMENDED COMPLAINT**<br><br>Hon. John A. Kronstadt<br><br>Date:          October 19, 2015<br>Time:          8:30 a.m.<br>Courtroom:   750 |

# **TABLE OF CONTENTS**

Page

I. INTRODUCTION .................................................................................. 1

II. BACKGROUND ................................................................................... 5

    A. ARCA and the Individual Defendants ..................................... 5

    B. ARCA's Appliance Replacement Programs in California ................. 6

    C. The Board of Equalization Begins a Sales and Use Tax Examination Concerning ARCA's California Operations ................. 6

    D. ARCA Enters the BOE's Managed Audit Program and Announces Restatements of Certain Financial Statements ................. 7

    E. Plaintiffs' Lawsuit ................................................................... 7

III. PLAINTIFFS DO NOT STATE A CLAIM FOR SECURITIES FRAUD UNDER SECTION 10(B) .................................................... 8

    A. The Heightened Pleading Requirements Applicable to Plaintiffs' Securities Fraud Claim .......................................... 8

    B. Plaintiffs' Allegations Do Not Give Rise to a Strong Inference That Any Defendant Acted With Scienter ........................ 10

        1. Plaintiffs' "Confidential Witnesses" ......................... 10

        2. Mr. Cameron's Temporary Retirement and Mr. Cammerrer's Resignation ...................................... 13

        3. The Individual Defendants' Stock Transactions ........... 15

        4. Plaintiffs' Reliance on California Revenue and Taxation Code Provisions ...................................... 17

        5. Restatement of Certain Financial Statements ............. 17

        6. Viewing Plaintiffs' Allegations Holistically, the Most Compelling Inference Is That Defendants Acted Without Fraudulent Intent .................................. 20

    C. Plaintiffs Fail to Plead with Particularity Facts That Establish Defendants Made Materially False or Misleading Statements ........... 21

IV. PLAINTIFFS CANNOT SAVE THEIR CLAIMS WITH BOILERPLATE ALLEGATIONS OF AN UNSPECIFIED "SCHEME" ........................................................................................ 23

V. PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION OF SECTION 20(A) ............................................................................... 24

VI. CONCLUSION ................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page(s)**

*DiLeo v. Ernst & Young,*
  901 F.2d 624 (7th Cir. 1990) ............................................................... 16

*DSAM Global Value Fund v. Altris Software, Inc.,*
  288 F.3d 385 (9th Cir. 2002) ............................................................... 18

*Dura Pharmaceuticals, Inc. v. Broudo,*
  544 U.S. 336 (2005) ............................................................................. 4

*Ernst & Ernst v. Hochfelder,*
  425 U.S. 185 (1976) ............................................................................. 9

*In re Cypress Semiconductor Sec. Litig.,*
  1992 WL 394927 (N.D. Cal. Sept. 23, 1992) ...................................... 16

*In re Hansen Natural Corp. Sec. Litig.,*
  527 F. Supp. 2d 1142 (C.D. Cal. 2007) ........................................... 4, 22

*In re Int'l Rectifier Corp. Sec. Litig.,*
  2008 WL 4555794 (C.D. Cal. May 23, 2008) ..................................... 18

*In re McKesson HBOC, Inc. Sec. Litig.,*
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ............................................. 16

*In re NVIDIA Corp. Sec. Litig.,*
  768 F.3d 1046 (9th Cir. 2014) ...................................................... 15, 18

*In re Pacific Gateway Exch., Inc., Sec. Litig.,*
  169 F. Supp. 2d 1160 (N.D. Cal. 2001) ............................................. 18

*In re Silicon Graphics Inc. Sec. Litig.,*
  183 F.3d 970 (9th Cir. 1999) ......................................................... 9, 10

*In re Software Toolworks, Inc. v. Painewebber, Inc.,*
  50 F.3d 615 (9th Cir. 1995) ............................................................... 18

*In re U.S. Aggregates, Inc. Sec. Litig.,*
  235 F. Supp. 2d 1063 (N.D. Cal. 2002) ............................................. 13

*In re Worlds of Wonder Sec. Litig.,*
  35 F.3d 1407 (9th Cir. 1994) ...................................................... 16, 18

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                             **Page(s)**

*Mathews v. Centex Telemanagement*,
    1994 WL 269734 (N.D. Cal. June 8, 1994) ...................................... 16

*McCasland v. FormFactor, Inc.*,
    2008 WL 2951275 (N.D. Cal. July 25, 2008) ................................. 12

*Medhekar v. District Court*,
    99 F.3d 325 (9th Cir. 1996) ....................................................... 4

*Metzler Inv. GMBH v. Corinthian Colleges, Inc.*,
    540 F.3d 1049 (9th Cir. 2008) ............................................ 5, 16, 21

*Morse v. McWhorter*,
    200 F. Supp. 2d 853 (M.D. Tenn. 2000) ...................................... 16

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ....................................................... 9

*S. Ferry L.P. No. 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) .................................................. 9, 19

*Schuster v. Symmetricon, Inc.*,
    2000 WL 33115909 (N.D. Cal. Aug. 1, 2000) ............................. 16

*Stavroff v. Meyo*,
    129 F.3d 1265, 1997 WL 720475 (6th Cir. 1997) ....................... 19

*Steed v. Warrior Capital, LLC*,
    2007 WL 1110757 (W.D. Okla. Apr. 11, 2007) .......................... 24

*TCS Capital Management, LLC v. Apaz Partners, L.P.*,
    2008 WL 650385 (S.D.N.Y. Mar. 7, 2008) ................................. 24

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ....................................................... *passim*

*Thornton v. Micrografx, Inc.*,
    878 F. Supp. 931 (N.D. Tex. 1995) ............................................ 3

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ........................................... *passim*

1

**Statutes, Regulations and Rules**

2  15 U.S.C. §78u-4(b)......................................................................8, 9, 21

3  Cal. Rev. & Tax. Code §§6351-6423 ........................................................ 17

4  Fed. R. Civ. Proc. 9(b) ..................................................................1, 4, 8

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendants Appliance Recycling Centers of America, Inc. ("ARCA" or the "Company"), Edward Cameron and Jeffrey Cammerrer (the "Individual Defendants") respectfully submit this memorandum in support of their motion to dismiss the Amended Complaint ("AC").[1]

## I.     INTRODUCTION

Plaintiffs' amended complaint should be dismissed because it does not plead any plausible theory of scienter against any defendant under the heightened requirements of the Private Securities Litigation Reform Act ("PSLRA"), nor does it plead its allegations with the particularity that is required under Rule 9(b) and Ninth Circuit law.

ARCA sells and recycles major household appliances throughout North America, operates the Appliance Smart chain of stores, and provides turnkey appliance recycling and replacement services for utility companies and other sponsors of energy efficiency programs.  AC ¶¶2, 25.  In August 2014, ARCA announced that it had a potential disagreement with the California Board of Equalization ("BOE").  ARCA had not collected or remitted sales tax on appliance replacement sales made through its partnerships with local utility companies in California, because it believed it was not required to do so.  The BOE commenced an examination relating to these issues, ultimately disagreeing with ARCA's position.  As a result, ARCA announced a potential assessment of approximately $4 million in back sales taxes and interest, covering the time period from 2011 through the third quarter of 2014, and restated its financial statements for those periods.

But the mere fact that the Company had a disagreement with California's tax regulators does not mean that fraud was committed.  In order to proceed with a securities fraud claim, plaintiffs must allege particularized facts giving rise to a

---

[1]  Mark G. Eisenschenk was named as a defendant in the original complaint, but was dropped by plaintiffs in the AC and is no longer a named defendant in this action.

*strong inference* that defendants made false and misleading statements either intentionally or with deliberate recklessness.  This strong inference of fraud must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Plaintiffs do not allege facts giving rise to any inference—much less the required strong inference—of scienter.  As a threshold matter, the AC is premised on an irrational theory of fraud that *lacks any alleged motive or purpose*—the supposed fraud is not alleged to have provided any benefit to the Company or the Individual Defendants.  Plaintiffs contend that ARCA "knew" that its appliance replacement sales were taxable in California but offer no reason why the Company would not have simply passed on those sales taxes to its customers (as retailers commonly do in California), if it believed it had an obligation to do so.  The collection and remittance of these taxes from customers would have been revenue-neutral to the Company, and the AC offers no allegation whatsoever explaining how any defendant would have benefitted from ARCA failing to collect those taxes.  Plaintiffs' purely conclusory allegation that defendants, with no apparent motivation, deliberately misled shareholders by failing to account for sales tax owed to California, comes nowhere close to satisfying the burden under the heightened pleading standards imposed by the PSLRA.

Not only does the AC lack any plausible theory of scienter, but judicially noticeable facts actually establish the opposite – and result in a *negative inference* of scienter.  Although plaintiffs make the conclusory allegation that defendants were motivated to commit fraud in order to sell their stock at inflated prices, they do not allege that either of the Individual Defendants actually sold any of their stock during the putative class period.  To the contrary, it is a judicially noticeable fact that Mr. Cameron *purchased* shares during that time.  As courts have recognized, it is a "nonsensical premise" that defendants would "conceal facts and misrepresent information [without] . . . enjoying the fruits of their fraud by selling

1    their stock." *Thornton v. Micrografx, Inc.*, 878 F. Supp. 931, 938 (N.D. Tex. 1995).

2         The remaining handful of allegations in the AC are conclusory and do not

3    salvage the plaintiffs' deficient "fraud without any purpose" theory.  For example,

4    plaintiffs offer purported statements from two so-called "confidential witnesses"

5    who are not even alleged to be former employees or to have any inside knowledge

6    or information regarding the Company.  And the purported statement by one of the

7    witnesses actually ***negates*** any inference of scienter:  that witness is offered for his

8    belief that "ARCA was under the impression that it did not need to charge sales tax

9    because the appliance replacement program was 'publicly funded.'"  AC ¶58.  The

10   only other "allegation" that plaintiffs offer is not only irrelevant to scienter, but is

11   demonstrably false.  Plaintiffs suggest that ARCA posthumously "cleaned house"

12   by forcing Mr. Cameron to retire and Mr. Cammerrer to resign from their positions.

13   Even if this allegation were true, it offers no inference regarding the alleged state of

14   mind of either Mr. Cameron or Mr. Cammerrer during the putative class period—in

15   fact, the natural inference is that they *did not know* about the tax issue.  But in any

16   event, this allegation is contradicted by the judicially noticeable facts that Mr.

17   Cameron in reality remained with the Company and Mr. Cammerrer agreed to make

18   himself available to assist the Company following his departure.  None of

19   plaintiffs' unfounded allegations, whether considered separately or taken together,

20   establishes the required strong inference of scienter.

21         The AC should also be dismissed for the additional reason that it does not

22   plead any of the particularized facts that are required in order to pursue an

23   accounting-based fraud claim.  It is well-established that "the mere publication of a

24   restatement is not enough to create a strong inference of scienter."  *Zucco Partners,*

25   *LLC v. Digimarc Corp.,* 552 F.3d 981, 1000 (9th Cir. 2009)  There is no

26   articulation of *how* any defendant supposedly "knew" the Company's accounting

27   methodology for the taxes was wrong, *when* they allegedly knew it, how they

28   acquired any such "knowledge" of *what* was wrong, and no allegation regarding

what any defendant had to *gain* from any alleged fraudulent scheme.  Neither does the AC address the judicially noticeable fact that ARCA's independent auditors provided unqualified audit opinions for each of the financial statements contained in the annual reports issued during the putative class period.  *See In re Hansen Natural Corp. Sec. Litig.*, 527 F. Supp. 2d 1142, 1158 (C.D. Cal. 2007) (independent auditor's unqualified opinion was "'highly probative' of an absence of scienter" for purposes of motion to dismiss securities fraud claim).

The AC suffers from other flaws, such as the failure to plead the falsity of many of ARCA's financial statements with the particularity required by the PSLRA.  And because plaintiffs have not satisfied their pleading burden with respect to their primary securities fraud claim under Section 10(b) of the Securities Exchange Act, their "control person" claims under Section 20(a) of the Exchange Act necessarily should also be dismissed.

The only inference that can be drawn from the AC is that ARCA's sales tax issues resulted from, at worst, an honest mistake—not fraud.  The federal securities laws are not intended to be an insurance policy for those who take the risk of investing in a company that experiences a business challenge affecting its stock price.  *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 345 (2005) (the "objective" of the securities laws is "not to provide investors with broad insurance against market losses").  That is why the PSLRA, Rule 9(b) and Ninth Circuit law strictly require that plaintiffs must plead actual facts establishing scienter before they will be allowed to proceed beyond the pleadings stage.  *See Medhekar v. District Court*, 99 F.3d 325, 328 (9th Cir. 1996) ("Congress clearly intended that complaints in these securities actions should stand or fall based on the actual knowledge of the plaintiffs rather than information produced by the defendants after the action has been filed.").  The AC is based on nothing more than an implausible theory of fraud and a series of conclusory assertions, and should be dismissed.

## II.   BACKGROUND[2]

### A.   ARCA and the Individual Defendants

ARCA is in the business of selling and recycling major household appliances throughout North America.  AC ¶¶2, 25.  It operates a chain of company-owned retail stores under the Appliance Smart name, and also provides turnkey appliance recycling and replacement services for utility companies and other sponsors of energy efficiency programs.  *Id.*  The company employs over 300 people, and generates more than $100 million in annual revenue.  *Id.* ¶3.  ARCA is headquartered in Minneapolis, Minnesota.  *Id.* ¶20.

Defendant Edward ("Jack") Cameron is ARCA's founder and its long-time Chairman, President and Chief Executive Officer.  *Id.* ¶21.  On August 13, 2014, Mr. Cameron retired from the positions of President and Chief Executive Officer.  *Id.*  Although plaintiffs characterize Mr. Cameron's August 2014 retirement as a "departure" (*id.* ¶63), in reality Mr. Cameron remained with the Company and continued to serve as Chairman of ARCA's Board of Directors.  RJN, Ex. A.[3]  Mr. Cameron, who was 74 years old in August 2014, stated at the time that "[a]fter more than 35 years as the head of ARCA," he believed it was "the right time to turn ARCA's leadership over to the next generation."  *Id.*  Mr. Cameron's planned retirement was short-lived, however.  On May 18, 2015, ARCA re-appointed Mr. Cameron to the positions of President and Chief Executive Officer, which he continues to hold today.  RJN, Ex. B.

Defendant Jeffrey Cammerrer served as ARCA's Chief Financial Officer from October 2012 until November 21, 2014.  AC ¶22.  On November 3, 2014, ARCA announced that Mr. Cammerrer would be resigning, effective November 21,

---

[2] The facts set forth are taken from the AC and from documents which are properly subject to judicial notice.  All documents that are referenced are attached to defendants' concurrently-filed Request for Judicial Notice ("RJN").

[3] The Court may appropriately take judicial notice of ARCA's SEC filings for purposes of this motion.  *See, e.g., Metzler Inv. GMBH v. Corinthian Colleges, Inc.,* 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).

2014, in order to take a new position as Chief Financial Officer of DMS Health Technologies, a company in the health care industry. *Id.* ¶62; RJN, Ex. C. ARCA also announced that Mr. Cammerrer would "continue to assist the company with various matters to support an orderly transition through the first quarter of 2015." RJN, Ex. C.

### B.     ARCA's Appliance Replacement Programs in California

Utility companies often provide assistance and incentives for their customers to replace old, inefficient household appliances with newer, more energy efficient models. AC ¶27. Utilities typically enter into contracts with appliance replacement providers, like ARCA, to carry out these programs. *Id.* When ARCA participates in these programs, it bills and is paid directly by the utility companies based on the specific model of appliance that it sells to the utility company and provides to the customer. *Id.* ¶26. In California, ARCA supplies ENERGY STAR® energy efficient appliances to low income utility customers in the Los Angeles area, primarily through contracts with the Southern California Public Power Authority ("SCPPA") and SCPPA's participating members, including the Los Angeles Department of Water and Power. *Id.* ¶28.

### C.     The Board of Equalization Begins a Sales and Use Tax Examination Concerning ARCA's California Operations

On August 6, 2014, ARCA announced that the California Board of Equalization ("BOE") had begun a sales and use tax examination covering the Company's California operations for 2011, 2012 and 2013. *Id.* ¶52. A portion of ARCA's California operations in those years consisted of appliance replacement sales under programs conducted by utility companies, for which the company did not assess, collect or remit state sales tax. *Id.* For a number of reasons, including the fact that these appliance replacement programs benefited low-income customers and were paid for by public utility ratepayer funds, ARCA believed that its appliance replacement sales through these programs could be exempt from

1    California sales and use tax.  *Id.*  The Company's independent auditors from the

2    national accounting firm of Baker Tilly Virchow Krause LLP provided unqualified

3    clean audit opinions for each of ARCA's financial statements in its annual reports

4    for these years.  *See* RJN, Exs. D-F.  ARCA acknowledged, in announcing the

5    BOE's examination, that it was possible that the BOE would disagree with the

6    Company's position and assess taxes for the transactions in question.  AC ¶52.

7
8
        **D.    ARCA Enters the BOE's Managed Audit Program and Announces Restatements of Certain Financial Statements**

9         During the fourth quarter of 2014, the BOE informed ARCA that it did not

10   agree with the Company's interpretation of the California sales tax laws.  *Id.* ¶54.

11   ARCA then applied for, and received, approval from the BOE to participate in the

12   BOE's Managed Audit Program, which allows ARCA to conduct a self-

13   examination related to state sales and use taxes, covering the period from the

14   beginning of 2011 through September 30, 2014.  *Id.*  In an SEC filing dated

15   February 12, 2015, ARCA stated that it believed that at the conclusion of the

16   Managed Audit Program, "the Company will be assessed at least $4.0 million ($2.6

17   million net of income taxes) in sales tax and interest related to the appliance

18   replacement programs that [ARCA] administered on behalf of [its] customers on

19   which [it] did not assess, collect or remit sales tax." *Id.* ¶55.

20        In the same filing, ARCA stated that it had concluded that its previously

21   issued financial statements for the quarterly and annual periods from the first

22   quarter of 2011 through the third quarter of 2014 required the correction of amounts

23   previously reported and should no longer be relied upon.  *Id.*  ARCA made that

24   announcement notwithstanding the fact that the Managed Audit remains ongoing

25   and no determination has yet been made as of the date of this motion.

26        **E.    Plaintiffs' Lawsuit**

27        Plaintiffs filed this putative class action lawsuit on March 6, 2015, and filed

28   the AC on July 27, 2015.  The AC alleges that ARCA, Mr. Cameron and Mr.

1   Cammerrer violated Section 10(b) of the Securities Exchange Act by failing to

2   disclose, in various financial statements covering the time period from January 1,

3   2011 to September 30, 2014, that: (1) ARCA's financial statements failed to

4   include up to $3.9 million of sales tax expense and tax liabilities; and (2) ARCA

5   lacked adequate internal controls over its financial reporting.  *See* AC ¶51.

6   Plaintiffs also allege "control person" claims against Messrs. Cameron and

7   Cammerrer under Section 20(a) of the Exchange Act.

**III.   PLAINTIFFS DO NOT STATE A CLAIM FOR SECURITIES FRAUD UNDER SECTION 10(b)**

**A.   The Heightened Pleading Requirements Applicable to Plaintiffs' Securities Fraud Claim**

11       A securities fraud complaint is required to satisfy the heightened pleading

12   requirements mandated by Federal Rule of Civil Procedure 9(b) and the PSLRA.

13   *Zucco*, 552 F.3d at 990.[4]  Rule 9(b) requires a party alleging fraud to "state with

14   particularity the circumstances constituting fraud or mistake."  But securities fraud

15   claims are held to an even higher and stringent pleading standard.  Since 1995, all

16   securities fraud complaints are additionally "subject to the more exacting pleading

17   requirements of the PSLRA" which "amended the Securities Exchange Act to

18   require that a complaint plead with particularity both falsity and scienter."  *Zucco*,

19   552 F.3d at 990 (internal quotation marks omitted).

20       In order to adequately allege falsity, the complaint must "specify each

21   statement alleged to have been misleading, the reason or reasons why the statement

22   is misleading, and, if an allegation regarding the statement or omission is made on

23   information and belief, the complaint shall state with particularity all facts on which

24   that belief is formed."  15 U.S.C. §78u-4(b)(1)(B).

25       To adequately plead scienter, the complaint must "state with particularity

---

[4]   The required elements to establish a claim under Section 10(b) and the SEC's Rule 10b-5 are:  "(1) a material misrepresentation or omission of fact, (2) scienter, (3) a connection with the purchase or sale of a security, (4) transaction and loss causation, and (5) economic loss."  *Zucco*, 552 F.3d at 990 (citation omitted).

facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2)(A) (emphasis added).[5]   The Supreme Court has defined the term "strong inference" to mean an inference that is "more than merely plausible or reasonable—it must be ***cogent and at least as compelling as any opposing inference of nonfraudulent intent.***"  *Tellabs,* 551 U.S. at 314 (emphasis added).  In conducting the evaluation required by *Tellabs,* courts "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 323-24.  A securities fraud complaint will survive a motion to dismiss under the *Tellabs* analysis "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324; *accord Zucco,* 552 F.3d at 991 ("A court must compare the malicious and innocent inferences cognizable from the facts pled in the complaint, and only allow the complaint to survive a motion to dismiss if the malicious inference is at least as compelling as any opposing innocent inference.").

In the Ninth Circuit, a plaintiff's allegations of scienter must create a strong inference that "the defendants made false or misleading statements ***either intentionally or with deliberate recklessness.***" *Zucco,* 552 F.3d at 991 (emphasis added) (internal quotation marks omitted).  Deliberate recklessness is considered "no less than a degree of recklessness that strongly suggests actual intent." *In re Silicon Graphics Inc. Sec. Litig.,* 183 F.3d 970, 979 (9th Cir. 1999), *abrogated on other grounds by S. Ferry L.P. No. 2 v. Killinger,* 542 F.3d 776, 784 (9th Cir. 2008).  "To meet this pleading requirement, the complaint must contain allegations of specific contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made." *Ronconi v. Larkin,* 253 F.3d 423, 432 (9th Cir. 2001) (internal

---

[5] Scienter is defined as "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n.12 (1976).

1   quotation marks omitted).  "[A]lthough facts showing mere recklessness or a

2   motive to commit fraud and opportunity to do so may provide some reasonable

3   inference of intent, they are not sufficient to establish a *strong* inference of

4   deliberate recklessness."  *Silicon Graphics*, 183 F.3d at 974.

5
   **B.    Plaintiffs' Allegations Do Not Give Rise to a Strong
6          Inference That Any Defendant Acted With Scienter.**

7         The Ninth Circuit has instructed that the comparative analysis required by

8   *Tellabs* entails a "dual inquiry":  (1) the Court must "determine whether any of the

9   plaintiff's allegations, standing alone, are sufficient to create a strong inference of

10  scienter"; and (2) if none of the allegations are sufficient, the Court must then

11  "conduct a 'holistic' review of the same allegations to determine whether the

12  insufficient allegations combine to create a strong inference of intentional conduct

13  or deliberate recklessness."  *Zucco*, 552 F.3d at 992.

14        The AC offers the following five categories of allegations:

15      (1)    purported statements from unnamed confidential witnesses from
              outside the Company, AC ¶¶58-59;
16

17      (2)    Mr. Cameron's temporary retirement and Mr. Cammerrer's resignation
              from the Company, *id.* ¶¶61-63;

18      (3)    a purported desire by Messrs. Cameron and Cammerrer to make false
              statements in order to benefit from the sale of ARCA stock from their
19            personal portfolios, *id.* ¶93;

20      (4)    a reference to the sales tax exemptions listed in the California Revenue
              and Taxation Code, *id.* ¶60; and
21

22      (5)    ARCA's restatement of certain financial statements, *id.* ¶¶64-78.

23        As explained below, none of these allegations—whether standing alone or

24  taken together—create any inference (let alone the required strong inference) that

25  any defendant acted to defraud investors either intentionally or with deliberate

26  recklessness.

27        **1.    Plaintiffs' "Confidential Witnesses."**

28        Plaintiffs rely on purported statements from two unnamed "confidential

-10-

witnesses," neither of which claims to have ever worked at ARCA or otherwise have any inside information or knowledge about ARCA's sales tax procedures or financial disclosures.  AC ¶¶58-59.  The first "witness" is purportedly a director at the SCPPA, one of ARCA's customers, who allegedly "stated to Plaintiffs' investigator that ARCA executives contacted him about the BOE audit, and claimed that ARCA was under the impression that it did not need to charge sales tax because the appliance replacement program was 'publicly funded.'"  *Id.* ¶58.  The other "witness" is an unnamed source from "City Appliance & Sales, a company that provides appliance replacement for Lompoc's low-income energy program," who "told Plaintiffs' investigator that they do charge sales tax on all replacement units distributed as part of its appliance replacement program."  *Id.* ¶59.

Neither of these alleged statements comes anywhere close to supporting a strong inference of scienter.  "[A] complaint relying on statements from confidential witnesses must pass two hurdles to satisfy the PSLRA pleading requirements.  First, the confidential witnesses whose statements are introduced to establish scienter must be described with sufficient particularity to establish their reliability and personal knowledge."  *Zucco*, 552 F.3d at 995.  "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter."  *Id.*  Plaintiffs' allegations are insufficient on both counts.

First, plaintiffs have not established that either of their confidential witnesses is reliable.  The SCPPA Director purports to relate a conversation with unnamed "ARCA executives" at some unspecified date.  AC ¶58.  This hearsay allegation is clearly insufficient.  *See Zucco*, 552 F.3d at 997 ("A majority of the confidential witnesses base their knowledge on vague hearsay, which is not enough[.]").  As to the supposed person from City Appliance & Sales, the reliability of a statement from one of ARCA's potential *competitors* in the appliance replacement business, who does not profess to have any personal knowledge of ARCA's tax practices,

-11-

could hardly be considered reliable, and in fact is inherently questionable.

But more importantly, even if both confidential witness statements are taken at face value, neither has any bearing on defendants' purported scienter. The SCPPA Director allegedly explained to plaintiffs' investigator that he believed ARCA's interpretation of the California sales tax requirements was "not common" (AC ¶58), but the question is not what the SCPPA Director knew about sales tax requirements, but rather what *defendants knew* and believed about those requirements when they were allegedly misleading investors. Moreover, the proffered SCPPA Director actually *negates* any inference of scienter. According to his statement, "ARCA executives contacted him about the BOE audit, and claimed that ARCA was under the impression that it did not need to charge sales tax because the appliance replacement program was 'publicly funded.'" *Id.* Assuming those hearsay statements to be accurate, that would support an inference that ARCA believed that it did not need to collect and remit sales tax. There is no allegation that the SCPPA Director ever shared his alleged views regarding the sales tax requirements with anyone at ARCA during the putative class period. Nor is there any allegation that SCPPA ever questioned why ARCA was not charging sales tax on its sales to SCPPA. If it was so "uncommon" for a company like ARCA not to collect sales tax, why didn't the SCPPA Director raise the issue or ask questions?

Plaintiffs fare no better with their second witness. *Id.* ¶¶13, 59. The fact that an employee of another company believed that its appliance replacement sales were taxable has no bearing on whether *defendants* believed that ARCA's sales were taxable under California tax law, particularly given the lack of any allegation that he or she ever had contact with anyone from ARCA or had any personal familiarity or knowledge of ARCA's business. *See, e.g., McCasland v. FormFactor, Inc.,* 2008 WL 2951275, at *8 (N.D. Cal. July 25, 2008) (no scienter where confidential witnesses not alleged "to have had any interaction or communication with any of the defendants, or to have provided any defendant with information, or to have

heard or read any statement by any defendant, that contradicted or even cast doubt on a public statement made during the class period.").

Neither of the confidential witnesses support a strong inference of defendants' scienter for the simple reason that they do not and cannot say anything about defendants' knowledge of California sales tax requirements during the putative class period. *See, e.g.*, *In re U.S. Aggregates, Inc. Sec. Litig.*, 235 F. Supp. 2d 1063, 1074 (N.D. Cal. 2002) (accounting fraud claim not corroborated where "none of the confidential witnesses have any first-hand knowledge of [defendant's] accounting decisions").

### 2.   Mr. Cameron's Temporary Retirement and Mr. Cammerrer's Resignation.

Plaintiffs also make the unfounded allegations that Mr. Cameron's August 2014 retirement from his positions as President and CEO, and Mr. Cammerrer's November 2014 resignation from his position as CFO, "provide strong indication that ARCA's violation was not just an innocent oversight.  The mistake was so serious and unforgivable that ARCA decided to 'clean house' and terminate both Cameron and Cammerrer." AC ¶¶61-63.  Yet, the only factual allegation that the AC offers in support of the supposed connection between these personnel changes and the sales tax issue is that these things happened within several months of each other.  The Ninth Circuit has unambiguously held that conclusory allegations based on temporal proximity are not enough:  "Mere conclusory allegations that [an officer] resigns or retires during the class period or shortly before the corporation issues its restatement, without more, cannot support a strong inference of scienter." *Zucco*, 552 F.3d at 1002.  "Absent allegations that the resignation at issue was uncharacteristic when compared to the defendant's typical hiring and termination patterns or was accompanied by suspicious circumstances, the inference that the defendant corporation forced certain employees to resign because of its knowledge of the employee's role in the fraudulent representations will never be as cogent or

as compelling as the inference that the employees resigned or were terminated for unrelated personal or business reasons." *Id.*

These allegations also ignore judicially noticeable facts demonstrating that the far more compelling inference is that Mr. Cameron's retirement and Mr. Cammerrer's resignation were for the reasons they gave. With respect to Mr. Cameron, there was nothing objectively "suspicious" about his retirement at the age of 74 years old, after having served the Company since founding it more than three decades ago. AC ¶21; RJN, Ex. A. He stated at the time of his retirement that "[a]fter more than 35 years as the head of ARCA" he believed it was "the right time to turn ARCA's leadership over to the next generation." RJN, Ex. A. Moreover, while plaintiffs erroneously claim that Mr. Cameron's retirement was a "departure" from the Company (AC ¶63), he in fact went nowhere. Mr. Cameron continued to serve as Chairman of ARCA's Board of Directors (RJN, Ex. A), and less than a year later, in May 2015, the company *re-appointed Mr. Cameron to the same positions of President and CEO* (RJN, Ex. B). If Mr. Cameron's retirement was prompted, as plaintiffs suggest, by his role in an "unforgivable" fraud (AC ¶63), one would hardly expect the company to both keep him on as Chairman and then welcome him back as CEO and President just months later.

As to Mr. Cammerrer, there is likewise not a single factual allegation supporting a strong inference that his departure had anything to do with anything other than what was disclosed—namely, that he had decided to pursue another CFO position at a different company. AC ¶62; RJN, Ex. C. Although the AC characterizes Mr. Cammerrer's new job as the CFO of DMS Health Technologies as a "less prestigious position" (AC ¶62), it offers nothing but its own conclusory assertions. And even taking the AC's unsupported assertion as true for purposes of this motion, employees accept "less prestigious positions" all the time, for any number of personal and professional reasons. Moreover, like Mr. Cameron, Mr. Cammerrer was expressly asked by the Company to make himself available

-14-

1  following his resignation in order "to assist the company with various matters to

2  support an orderly transition through the first quarter of 2015."  RJN, Ex. C.  The

3  only compelling inference to be drawn from these facts is that Mr. Cammerrer

4  resigned from ARCA to pursue a new professional opportunity.  *See In re NVIDIA*

5  *Corp. Sec. Litig.*, 768 F.3d 1046, 1062-63 (9th Cir. 2014) (where "individuals

6  remained at NVIDIA in some type of advisory role" following their resignations,

7  "the most reasonable inference is that these departures were benign").

8       Finally, the AC itself characterizes Mr. Cameron's temporary retirement and

9  Mr. Cammerrer's resignation to take a new job as resulting from a "mistake."  AC

10 ¶62.  But a "mistake," even a "serious and unforgivable" one (*id.*), is not the same

11 thing as fraud.  Even if plaintiffs had plausibly alleged that the personnel changes

12 were connected to the sales tax issue (and they have not), the more compelling and

13 reasonable inference would be that the changes resulted from a "mistake" rather

14 than any fraud.  *See, e.g., Zucco*, 552 F.3d at 1002 ("[T]he resignation of KPMG as

15 Digimarc's independent accounting firm a month after the restatement was issued is

16 not surprising—it had just been partially responsible for the corporation's failure to

17 adequately control its accounting procedures.  This is not enough to support a

18 strong inference of scienter.").

19         **3.    The Individual Defendants' Stock Transactions.**

20      The AC offers only one possible motive for its claims of securities fraud,

21 alleging that "Defendants were personally motivated to make false statements and

22 omit material information necessary to make the statements not misleading in order

23 to personally benefit from the sale of ARCA common stock from their personal

24 portfolios."  AC ¶93.  But the AC offers no specifics regarding the defendants'

25 supposed profits from their stock trading, and in fact does not even allege that either

26 Individual Defendant actually sold stock during the putative class period.  Indeed,

27 contrary to plaintiffs' conclusory allegation, a review of the judicially noticeable

28 SEC filings indicates that was probably no accident.  Mr. Cameron in fact

1  *purchased* 20,000 shares of ARCA stock during that time.  *See* RJN, Ex. G.  It

2  obviously does not logically follow that Mr. Cameron would purchase shares that

3  he knew to be fraudulently inflated.  *See, e.g.*, *In re McKesson HBOC, Inc. Sec.*

4  *Litig.*, 126 F. Supp. 2d 1248, 1269 (N.D. Cal. 2000) (courts should not "'indulge

5  irrational inferences of . . . fraudulent intent'"); *DiLeo v. Ernst & Young*, 901 F.2d

6  624, 629 (7th Cir. 1990) ("One who believes that another has behaved irrationally

7  has to make a strong case").

8         Federal courts have consistently held that these facts strongly negate, rather

9  than support, any inference of scienter.  *See, e.g.*, *Metzler Inv. GMBH*, 540 F.3d at

10  1067 ("Digiovanni meanwhile sold nothing at all, suggesting that there was no

11  insider information from which to benefit.").[6]  The lack of any allegation that the

12  Individual Defendants sold their stock, taken together with the judicially noticeable

13  fact that Mr. Cameron actually *purchased* stock, can only result in a logical

14  inference that defendants did not commit fraud.  *See In re Worlds of Wonder Sec.*

15  *Litig.*, 35 F.3d 1407, 1424-25 (9th Cir. 1994) ("if, as Plaintiffs allege, the Officers

16  knew that [the company] was heading for financial disaster, they probably would

17  have bailed out of their substantial holdings.  Each of the Officer Defendants, by

18  contrast, held onto most of their . . . stock and incurred the same large losses as did

19  the Plaintiffs themselves.") (internal citations omitted).

20

21

22

---

23  [6] *Accord Schuster v. Symmetricon, Inc.*, 2000 WL 33115909, at *8 (N.D. Cal. Aug. 1, 2000) (purchase of stock at allegedly inflated prices undermined any finding of
24  scienter); *Morse v. McWhorter*, 200 F. Supp. 2d 853 (M.D. Tenn. 2000) (company's decision to reinvest in its own stock undermined scienter, since it
25  would make no sense to knowingly purchase at inflated prices), *vacated on other grounds*, 290 F.3d 795 (6th Cir. 2002); *Mathews v. Centex Telemanagement*, 1994
26  WL 269734, at *8 (N.D. Cal. June 8, 1994) ("It would have made no sense to purchase that stock if defendants knew the prices to be inflated"); *In re Cypress*
27  *Semiconductor Sec. Litig.*, 1992 WL 394927, at *2 (N.D. Cal. Sept. 23, 1992) ("Rodgers' stock ownership, coupled with his failure to sell such stock, undermines
28  plaintiff's theory . . .").

### 4.   Plaintiffs' Reliance on California Revenue and Taxation Code Provisions.

Plaintiffs further contend that defendants' "should have" known that ARCA's appliance replacement sales in California were taxable because "all ARCA had to do was review the sales tax exemptions listed in §§ 6351-6423 of the California Revenue and Taxation Code to see that there is no sales tax exemption for appliances purchased by public utilities." AC ¶60. But that "allegation" is nothing more than an untested legal conclusion concerning the interpretation of a statutory provision; it is not a factual allegation providing any inference regarding any defendant's scienter. The inquiry at the pleading stage is not what was required under the California tax code, but rather what defendants *knew* (or did not know) about this area of California tax law. Plaintiffs do not allege that Messrs. Cameron or Cammerrer (who are not lawyers), or anyone else at ARCA, knew of or reviewed any of the provisions of the California Revenue and Taxation Code that are cited in the AC, let alone that they understood those provisions to require collecting tax on ARCA's appliance replacement sales in California. Nor do plaintiffs offer any allegation from which the Court could infer that the CEO and CFO of a public company, doing business across the U.S. and Canada, should be charged with the duty of personally understanding the intricacies of the sales tax statutes in every state in which the company does business.

### 5.   Restatement of Certain Financial Statements.

Finally, plaintiffs allege that because ARCA restated certain financial statements, that "ARCA acknowledged that its financial statements for the restated periods were materially inaccurate" and thus did not comply with Generally Accepted Accounting Principles ("GAAP"). AC ¶¶64, 76.

But that is not enough to satisfy plaintiffs' heightened pleading burden on scienter. The Ninth Circuit has repeatedly held that "[i]n general, the mere publication of a restatement is not enough to create a strong inference of scienter."

*Zucco*, 552 F.3d at 1000; *accord Worlds of Wonder*, 35 F.3d at 1426 ("The mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter.").  Under Ninth Circuit law, "even deliberate violations of [GAAP], without more, do not amount to fraud." *Worlds of Wonder*, 35 F.3d at 1426 (internal quotation omitted).[7]  Plaintiffs are required to plead when defendants allegedly knew an accounting violation occurred, what its magnitude was, and precisely how plaintiffs know that the violation was the product of an intent to deceive.  *See In re Pacific Gateway Exch., Inc., Sec. Litig.*, 169 F. Supp. 2d 1160, 1167 (N.D. Cal. 2001) (to plead a "strong inference" of fraud, plaintiffs must plead detailed facts showing "how or when each defendant became aware of the allegedly improper accounting practices" and "the extent of each defendant's contribution or involvement").[8]  This is particularly true where, as here, plaintiffs offer no plausible, particularized allegations from which the Court could infer that the Individual Defendants or other members of ARCA management were on notice of any accounting irregularities.  *See, e.g., NVIDIA*, 768 F.3d at 1064 (no inference of scienter where "Plaintiffs never plausibly allege that specific information was conveyed to [CEO] or others in NVIDIA's management team"); *In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *13 (C.D. Cal. May 23, 2008) (accounting "violations, even significant ones or ones requiring large or multiple restatements, must be augmented by other specific allegations that defendants possessed the requisite mental state").

There are two limited exceptions to the general rule that falsity itself does not support a strong inference of scienter.  Neither applies here.  First, "[f]alsity may itself be indicative of scienter where it is combined with allegations regarding a

[7] *Accord DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 390-91 (9th Cir. 2002) (despite admitted failure to follow GAAP, the "allegations of negligence are insufficient to establish a strong inference of" scienter).

[8] *Accord In re Software Toolworks, Inc. v. Painewebber, Inc.*, 50 F.3d 615, 628 (9th Cir. 1995) (facts must be pled establishing each defendants' "egregious refusal to see the obvious, or to investigate the doubtful . . . .").

1   management's role in the company that are particular and suggest that the

2   defendant had actual access to the disputed information." *Zucco*, 552 F.3d at 1000,

3   (citing *S. Ferry*, 542 F.3d at 785 (internal quotation marks omitted)).  But for this

4   exception to apply, allegations regarding management's role must be "buttressed

5   with detailed and specific allegations about management's exposure to factual

6   information within the company." *Id*.  The AC does not come close to satisfying

7   that standard.  Although plaintiffs make the conclusory allegation that Mr.

8   Cammerrer "was intimately knowledgeable of sales tax requirements," (AC ¶78)

9   they offer no "detailed and specific allegations" as required by *Zucco*, from which

10  that conclusion could plausibly be drawn.[9]

11         Falsity alone may also under limited circumstances support an inference of

12  scienter "where the information misrepresented is readily apparent to the defendant

13  corporation's senior management." *Zucco*, 552 F.3d at 1001.  But this exception

14  applies only where "the falsity is patently obvious—where the facts are prominent

15  enough that it would be absurd to suggest that top management was unaware of

16  them." *Id.* (internal quotation marks omitted).  Here, by contrast, plaintiffs offer no

17  allegation that *anyone* at ARCA—let alone management—was contemporaneously

18  aware that ARCA's accounting for its appliance replacement sales in California had

19  any issues.  And as described above, the Company's outside auditors reviewed and

20  gave unqualified audit opinions for ARCA's financial statements contained in its

21  annual reports issued during the putative class period.  *See, e.g.*, *Stavroff v. Meyo*,

22  129 F.3d 1265, 1997 WL 720475, at *6 (6th Cir. 1997) (table decision) ("a

23

---

24  [9]  Plaintiffs make only the boilerplate allegation that Mr. Cammerrer "managed all
    of the Company's day-to-day accounting operations," but the Ninth Circuit has

25  rejected far more detailed allegations as insufficient.  *See Zucco*, 552 F.3d at 1000-
    01 ("[A]llegations that Digimarc's management had access to the purportedly

26  manipulated quarterly accounting numbers, or that the management analyzed the
    inventory numbers closely, do not support the inference that management was in a

27  position to know that such data was being manipulated.").  And with respect to Mr.
    Cameron, the AC does not even make any similarly conclusory allegation that he

28  was familiar with California sales tax requirements.

-19-

1   company's reliance on the guidance of outside auditors is inconsistent with the
2   intent to defraud"); RJN, Exs. D-F.

3   **6.   Viewing Plaintiffs' Allegations Holistically, the Most Compelling Inference Is That Defendants Acted Without Fraudulent Intent.**
4

5      The AC's allegations of scienter fare no better when viewed holistically, as
6   required by the Supreme Court's decision in *Tellabs*.  Plaintiffs have not alleged
7   particularized facts to support *any* inference of intentional conduct or deliberate
8   recklessness, let alone the strong, cogent and compelling inference that is required.

9      The far more compelling inference to be drawn from the AC's allegations is
10  the most straight-forward one—that defendants did not know that the BOE would
11  take the position that California law required the collection and remittance of sales
12  tax on ARCA's appliance replacement sales in California.  If, as plaintiffs contend,
13  defendants *did* know that the sales at issue were taxable, then ***what reason would***
14  ***ARCA have had not to simply pass the sales taxes on to its customers?***  Why
15  would ARCA knowingly choose *not* to collect sales taxes from its customers?
16  Why would ARCA knowingly invite the risk of an audit by the BOE, which could
17  result in a substantial assessment of back taxes, penalties and interest, as well as the
18  risk that it would need to restate prior financial statements?  Plaintiffs do not offer
19  any allegation (nor could they) that collecting the taxes would have had any
20  financial effect on ARCA's bottom line, as those taxes would simply have been
21  collected and remitted to the state.  There was not one benefit (and none is
22  identified in the AC) for ARCA or any Individual Defendant to knowingly engage
23  in a "fraud" to avoid collecting sales taxes, yet there were many reasons why they
24  would not want to.

25     Other judicially noticeable facts further demonstrate that the obvious
26  inference is the more compelling one.  As discussed above, there is no allegation
27  that either Individual Defendant sold any shares of ARCA stock during the alleged
28  class period, and in fact, Mr. Cameron purchased additional shares during that time.

-20-

1  Far from being asked to leave as part of a "house cleaning," Mr. Cameron not only

2  continued to serve as ARCA's Chairman, but is now again serving as the

3  Company's CEO and President.  ARCA's independent auditors gave unqualified,

4  clean opinions on the Company's financial statements in the Company's annual

5  reports issued during the class period (*see* RJN, Exs. D-F), and plaintiffs do not

6  allege that the auditors (or anyone else, for that matter) ever identified the issue or

7  questioned why ARCA was not collecting and remitting sales tax on its California

8  appliance replacement sales.

9       Because plaintiffs do not plead facts giving rise to an inference of scienter

10  that is "cogent and at least as compelling as any opposing inference of

11  nonfraudulent intent," *Tellabs*, 551 U.S. at 314, the Court should dismiss the

12  Section 10(b) claims.

13       **C.   Plaintiffs Fail to Plead with Particularity Facts That
         Establish Defendants Made Materially False or Misleading
14       Statements**

15       While the AC should be dismissed in its entirety as a result of plaintiffs'

16  failure to plead facts supporting a strong inference of scienter, portions of plaintiffs'

17  misstatement claims under Section 10(b) should also be dismissed for the additional

18  and independent reason that the AC does not adequately allege falsity under the

19  heightened pleading standards required by the PSLRA.  Those stringent standards

20  require the AC to "specify each statement alleged to have been misleading, the

21  reason or reasons why the statement is misleading, and, if an allegation regarding

22  the statement or omission is made on information and belief, the complaint shall

23  state with particularity all facts on which that belief is formed."  15 U.S.C. §78u-

24  4(b)(1)(B).  As the Ninth Circuit has recognized, "By requiring specificity, [the

25  PSLRA] prevents a plaintiff from skirting dismissal by filing a complaint laden

26  with vague allegations of deception unaccompanied by a particularized explanation

27  stating *why* the defendant's alleged statements or omissions are deceitful."  *Metzler*

28  *Inv. GMBH*, 540 F.3d at 1061.  The AC should be dismissed because it does not

specify with sufficient particularity at least two categories of purported misstatements and/or omissions.

First, plaintiffs allege that a large number of ARCA's financial statements—for the quarterly and annual periods from the first quarter of 2011 through the third quarter of 2014—are false and misleading. AC ¶¶34-51.  With respect to the financial statements for periods in 2013 and 2014, plaintiffs claim that the alleged misstatements at issue involve purported overstatements of operating and net income, and set forth the alleged amounts of the claimed overstatements. *Id.* ¶¶37, 40, 42, 44, 46, 48, 50.  But in contrast, with respect to the allegedly misleading Form 10-K filings for 2011 and 2012, plaintiffs allege only that those forms "provided the Company's year-end financial results and position," *id.* ¶¶34, 35, and then generally allege that those financial results (and all of the other financial results reported by the company over a nearly four-year period) were misleading because "they misrepresented and failed to disclose that . . . ARCA's financial statements failed to include up to $3.9 million of sales tax expense and tax liabilities." AC ¶51.  That does not satisfy plaintiffs' burden to plead with particularity what they claim is false in ARCA's 2011 and 2012 financial statements.  Unlike with the statements covering 2013 and 2014, plaintiffs do not identify the specific financial numbers from 2011 and 2012 that are purported to be misleading, nor does the AC explain how those numbers are misleading or the amount by which they are misleading.  Accordingly, the Court should dismiss plaintiffs' claims that the financial results reported in ARCA's 2011 and 2012 Form 10-K filings were false and misleading. *See Hansen*, 527 F. Supp. 2d at 1152-53 (alleged misstatements are not pled with sufficient particularity where "Plaintiff alleges that Hansen's financial statements were false and misleading as a result of GAAP violations, but fails to explain which line items of the statements were false, why the statements were false, [and] the amount by which the financial statements were misstated").

1    Second, plaintiffs cite to various representations in ARCA's SEC filings

2    about the Company's internal controls, including: (1) representations that the

3    company's internal controls over financial reporting were effective, *see* AC ¶¶34,

4    35, 43; and (2) representations regarding any changes (or lack thereof) to the

5    company's internal controls over financial reporting, *see* AC ¶¶34-36, 39, 41, 43,

6    45, 47, 49.  Plaintiffs lump all of these statements together and allege in conclusory

7    fashion that they were false and misleading because "the Company lacked adequate

8    internal controls over its financial reporting." *Id.* ¶51.  This, too, fails to satisfy

9    plaintiffs' burden of pleading falsity with particularity.  Nowhere does the AC

10   identify the specific reasons why ARCA's representations that its internal controls

11   over reporting were effective were supposedly false.[10]  Nor do plaintiffs allege any

12   changes to ARCA's internal controls which would render false the company's

13   representations that there were no such changes.  The Court should therefore

14   dismiss plaintiffs' claims under Section 10(b) relating to alleged misstatements

15   involving internal controls.

16   **IV.    PLAINTIFFS CANNOT SAVE THEIR CLAIMS WITH**
         **BOILERPLATE ALLEGATIONS OF AN UNSPECIFIED**
17       **"SCHEME"**

18   Although the AC bears all the hallmarks of a classic "misstatement" case

19   brought under subsection (b) of the SEC's Rule 10b-5, Count I contains language

20   that is more traditionally associated with "scheme liability" claims brought under

21   subsections (a) and (c) of Rule 10b-5.  *See* AC ¶90 ("Defendants engaged in a plan,

22   scheme, conspiracy and course of conduct").  These boilerplate "scheme"

---

23   [10] Elsewhere in the AC, plaintiffs quote from an ARCA SEC filing in which the
24   Company stated that it had determined that "material weaknesses existed in the
     Company's internal control over financial reporting and that disclosure controls and
25   procedures were not effective at December 28, 2013 and through January 3, 2015."
     AC ¶55.  Plaintiffs do not allege with particularity the nature of any such "material
26   weaknesses" that rendered the company's previous statements regarding internal
     controls false.  And in any event, the SEC filing quoted by plaintiffs says nothing
27   about the effectiveness of the Company's internal controls before December 28,
     2013, so it cannot support plaintiffs' allegation that disclosures regarding internal
28   controls in earlier time periods were false.

-23-

1   allegations do not render plaintiffs' Section 10(b) claim legally sufficient.  The

2   AC's failure to plead facts from which a strong inference of scienter can be drawn

3   is fatal to their Section 10(b) claim, irrespective of whether it is considered a

4   "misstatement" claim, a "scheme" claim, or both.

5          In any event, plaintiffs do not adequately plead facts supporting a "scheme"

6   claim.  It is well-established that a plaintiff may not simply invoke the word

7   "scheme" in an attempt to recast a "statement that is, in essence, a

8   misrepresentation (or omission) claim under subsection (b) . . . as a claim under

9   subsection (a) or (c) so as to evade the pleading requirements which apply in

10  misrepresentation cases."  *Steed v. Warrior Capital, LLC*, 2007 WL 1110757, at *5

11  (W.D. Okla. Apr. 11, 2007).  While the AC apparently purports to plead a "scheme"

12  liability case based on the sales tax issue, the gravamen of its claims is the allegedly

13  false financial statements that resulted from alleged improper accounting for sales

14  tax.  *E.g.*, AC ¶¶7-8, 51, 87, 92-93.  It is thus apparent that the basis of plaintiffs'

15  "scheme" liability claim "is nothing more than a reiteration of the

16  misrepresentations and omissions that underlie [their] disclosure claim."  *TCS*

17  *Capital Management, LLC v. Apaz Partners, L.P.*, 2008 WL 650385, at *22

18  (S.D.N.Y. Mar. 7, 2008).  Such an attempt to "re-labe[l] the alleged misstatements

19  and omissions as 'manipulative and deceptive conduct'" does not "magically

20  transform [plaintiffs'] disclosure claim into a [scheme liability] claim."  *Id.*  Since

21  plaintiffs have failed to plead any "scheme" allegations against defendants, apart

22  from the alleged misrepresentations in ARCA's financial statements, plaintiffs'

23  claims should be analyzed only under Rule 10b-5(b).

24  ## V.     PLAINTIFFS FAIL TO STATE A CLAIM FOR VIOLATION
25  ##        OF SECTION 20(a)

26         Plaintiffs' Section 20(a) control-person claims against Messrs. Cameron and

27  Cammerrer should be dismissed because, as set forth above, plaintiffs have failed to

28  state a claim under Section 10(b) for the alleged primary violation.  *See, e.g.*,

-24-

*Zucco*, 552 F.3d at 990 ("Section 20(a) claims may be dismissed summarily . . . if a plaintiff fails to adequately plead a primary violation of section 10(b).").

## VI.    CONCLUSION

For the foregoing reasons, the Court should dismiss the AC.

Dated:  September 4, 2015                Respectfully submitted,

ORRICK, HERRINGTON & SUTCLIFFE LLP

By:  _____ */s/ Michael C. Tu*_____
                           Michael C. Tu

Attorneys for Defendants
Appliance Recycling Centers of America, Inc.,
Edward R. Cameron and Jeffrey A. Cammerrer

-25-