Laurence M. Rosen, Esq. (SBN 219683)
**THE ROSEN LAW FIRM, P.A.**
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi, Esq. (*Pro Hac Vice*)
**THE ROSEN LAW FIRM, P.A.**
275 Madison Ave, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

Counsel for Lead Plaintiffs

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JASON FEOLA, Individually and on behalf of all others similarly situated, | Case No: 2:15-CV-01654-JAK(AJWx) |
| Plaintiffs, | **SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS** |
| v. | |
| EDWARD R. CAMERON, JEFFREY A. CAMMERRER, and APPLIANCE RECYCLING CENTERS OF AMERICA, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

- 1 -

Lead Plaintiffs Karsan Value Funds and Peter B. Miller ("Plaintiffs"), by Plaintiffs' undersigned attorneys, individually and on behalf of all other persons similarly situated, allege the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of Defendants' public documents, announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Appliance Recycling Centers of America, Inc. ("ARCA" or the "Company"), analysts' reports and advisories about the Company, interviews with ARCA's clients and competitors, interviews with former ARCA employees, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action brought on behalf of a class consisting of all persons and entities, other than defendants and their affiliates, who purchased or otherwise acquired the common stock of ARCA from March 15, 2012 to February 11, 2015, inclusive (the "Class Period"), seeking to recover compensable damages caused by Defendants' violations of federal securities laws (the "Class").

2.      ARCA and its subsidiaries are in the business of selling and recycling major household appliances in North America. ARCA sells new household appliances through a chain of company-owned retail stores under the ApplianceSmart name and also provides turnkey appliance recycling and replacement services for electric utilities and other sponsors of energy efficiency programs through its wholly-owned subsidiary ARCA California, Inc.

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

3.     ARCA is a sophisticated and experienced company that has been in business since 1983. It currently employs over 300 people, and generates more than $100 million in revenue annually.

4.     The California Revenue and Taxation Code states clearly that all sales of tangible personal property in California are subject to sales tax, absent an applicable exemption. The list of exemptions is then spelled out in Sections 6351-6423 of the California Revenue and Taxation Code.

5.     The sales, or purchase, of appliances to, or by, public utilities as part of energy efficiency programs is not listed as one of the exemptions to the State sales tax.

6.     Nevertheless, ARCA never bothered to collect or remit sales tax for the appliances that it sold to utility companies as part of their appliance replacement programs. ARCA's excuse is that it simply did not think such sales were subject to sales tax because it was selling appliances to utilities under programs that are publicly-funded.

7.     If a seller (i.e. ARCA) believes that a purchaser is exempt from sales tax, California's Board of Equalization ("BOE") requires the seller to obtain a valid exemption certificate from the purchaser before invoicing the customer.

8.     ARCA never obtained any exemption certificates from its appliance replacement customers in California. None of ARCA's clients in California from whom ARCA failed to collect and remit sales tax had exemption certificates to provide to ARCA because none of them were exempt from sales tax.

9.     ARCA knew to collect sales tax for its appliance replacement programs in California because ARCA was collecting sales tax from appliance replacement contracts for low income customers in other states. For example, a former ARCA Senior Accountant ("CW1") informed Plaintiffs' investigator that she and the rest of

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

the accounting team understood that ARCA collected and remitted sales taxes in all states where they operated their appliance replacement programs.

10.     CW1 stated that ARCA's appliance replacement program in Washington was similar to what ARCA had in California; i.e. appliance replacement services for low income households through contracts with utility companies.

11.     According to CW1, company-wide policy dictated that all customers other than charities in possession of a specific type of exemption certificate must pay sales tax.

12.     CW1 also stated that it was the Company's strict policy to always check exemption certificates to ensure that a purchaser was exempt from sales tax.

13.     CW1 further stated that ARCA was subjected to sales tax audits from Texas, Georgia and Minnesota during her tenure from 2008 to 2012.

14.     During the Class Period ARCA's financial statements violated Generally Accepted Accounting Principles ("GAAP) and were false and misleading because they materially overstated operating income, net income and earnings per share by failing to account for over $3.9 million of sales tax expenses due the State of California.

15.     ARCA's violation of the California tax laws, and consequent false financial statements, could not be hidden forever.  On August 6, 2014, the Company issued a press release, announcing, among other things, that the California Board of Equalization ("BOE") was conducting an examination of sales and use taxes covering ARCA's appliance replacement sales in California during the period 2011-2013.

16.     On this news, the Company's shares fell $1.11 per share or over 27% to close at $2.99 per share on August 7, 2014.

17.     On February 11, 2015, the Company issued a press release, announcing, among other things, that its previously issued financial statements should no longer

- 4 -

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

be relied upon because of its failure to record sales tax expense and pay taxes due the State. In the press release, the Company stated, in part:

> ***The Company believes that the outcome from the Managed Audit Program will likely result in a Notice of Determination from the California BOE of an assessment of at least $4.0 million ($2.6 million net of income taxes), covering the entire period under audit.*** The Company has been working with outside consultants to arrive at our assessment estimate and will continue to engage the services of these sales tax experts throughout the Managed Audit Program process. Such assessment, however, would be subject to protest and appeal, and would not need to be funded until the matter has been fully resolved. Resolution could take up to three years. ***The Company anticipates that a pre-tax charge to earnings will be required and that previously issued unaudited consolidated financial statement for the fiscal quarters ended March 29, June 28 and September 27, 2014 and consolidated financial statements for the years ended December 28, 2013, December 29, 2012 and December 31, 2011 and the quarters in the years then ended will need to be restated.  Such previously issued consolidated financial statements should no longer be relied upon[.]***

(Emphasis added).

18.    On this news, the Company's shares fell $0.43 per share or over 14% to close at $2.54 per share on February 12, 2015.

19.    ARCA's excuse for not paying sales tax – that it was selling appliances to utilities under programs that are publically funded – finds no support whatever in the California Revenue and Taxation Code and Defendants knew this because ARCA collected and remitted sales tax for its appliance replacement businesses, including for its programs serving low income customers, that ARCA operated in other states.

20.    On August 13, 2014, exactly one week after ARCA announced the BOE audit, Defendant Cameron abruptly retired.  Cameron had served as President and CEO of ARCA since its inception.

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

21.     Defendant Cammerrer, who had quickly risen to become CFO of ARCA four years after joining the Company, suddenly resigned three months after the sales tax scandal came to light – to join a smaller, privately-held company.

22.     Shortly after the sales tax fraud was exposed, all but one member of ARCA's board of directors resigned.  On January 3, 2015, ARCA issued a proxy statement on Schedule 14A nominating four new members to replace the outgoing directors.

23.     As a result of Defendants' wrongful acts and omissions, and the resulting decline in the market value of the Company's common stock, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

24.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. § 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. § 8 240.10b-5).

25.     This Court has jurisdiction over the subject matter of this action pursuant to § 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

26.     Venue is proper in this District pursuant to §27 of the Exchange Act, 15 U.S.C. §78aa and 28 U.S.C. §1391(b), as a substantial part of the conduct complained of herein occurred and the Company conducts business in this District.

27.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

28.     Plaintiffs, as set forth in their PSLRA Certifications previously filed with the Court, acquired ARCA common stock at artificially inflated prices during the

Class Period and were damaged upon the revelation of the alleged corrective disclosures.

29.     Defendant ARCA sells new household appliances through a chain of company-owned retail stores under the ApplianceSmart name and also provides turnkey appliance recycling and replacement services for electric utilities and other sponsors of energy efficiency programs through its wholly owned subsidiary, ARCA Recycling, Inc.  ARCA is headquartered in Minneapolis, Minnesota and trades on the Nasdaq Capital Market ("NASDAQ") under the ticker symbol "ARCI."

30.     Defendant Edward R. Cameron ("Cameron") is ARCA's founder and served as the Company's Chairman, President and Chief Executive Officer since its inception in 1983 until his retirement from the positions of President and Chief Executive Officer of the Company on August 13, 2014.  Mr. Cameron has worked in the retail appliance business for over 32 years.

31.     Defendant Jeffrey A. Cammerrer ("Cammerrer") served as the Company's Chief Financial Officer from October 2012 until his resignation on November 21, 2014. He served as Vice President of Accounting and Finance from March 2012 until his appointment as Chief Financial Officer, and had previously served as Corporate Controller since July 2008. Mr. Cammerrer directed the Company's finance and accounting functions, including financial planning and reporting. He also managed all of the Company's day-to-day accounting operations, including treasury, taxes, billing, collections and accounts payable. Mr. Cammerrer held the position of director of finance for Milestone AV Technologies from September 2007 through July 2008. He also held several accounting management positions, including vice president of accounting, at Eschelon Telecom, Inc. from March 1997 through September 2007. He is a CPA (inactive) and holds a B.S. in accounting from North Dakota State University.

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

32.   CW1 stated that ARCA CFO Jeffrey Cammerrer signed off on everything in the accounting department and he was responsible for making sure the correct amount of state sales taxes was collected and paid.

33.   According to CW1, Cammerrer, as CFO and head of the accounting department, was responsible for signing off on all sales tax payments.

34.   CW2, an ARCA Senior Auditor and SOX Specialist who reported directly to CEO Cameron[1] from February 2009 to September 2012 confirmed that Cammerrer was responsible for sales tax payments.

35.   Defendants Cammerrer and Cameron are sometimes referred to herein as the "Individual Defendants."

36.   Defendant ARCA and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

**Background: ARCA's Business**

37.   ARCA is in the business of selling and recycling major household appliances throughout North America.  ARCA sells household appliances in the U.S. through its chain of eighteen Company-owned retail stores operating under the name ApplianceSmart.  ARCA provides appliance recycling in the U.S. through its wholly owned subsidiary ARCA Recycling, Inc. ("ARCA California"), a California company formed in 1991.

38.   ARCA's appliance recycling business consists of two primary segments: appliance recycling and appliance replacement.  For its appliance recycling service, ARCA generates revenue by charging fees for collecting and recycling appliances for utilities and other sponsors of energy efficiency programs.   For its appliance

---

[1]   A "SOX" or Sarbanes-Oxley Act specialist would not report directly to the CFO because that would compromise his ability to ensure compliance by the CFO and the CFO's staff with the rules governing internal financial control and reporting.

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

replacement program, ARCA generates revenue by charging fees for recycling and replacing old appliances with new ENERGY STAR appliances for energy efficiency programs sponsored by utility companies. For the appliance replacement service, ARCA bills and is paid directly by the utility companies based on the specific model of appliance that it sells to the utility company and is provided to the consumer.

39.  Utility companies often provide assistance and incentives for consumers to discontinue use of a surplus appliance or to replace their old, inefficient appliances with newer, more efficient models. Some utilities achieve this by offering appliance replacement programs for some segments of their customers, through which older model kitchen and laundry appliances are recycled and new highly efficient ENERGY STAR® units are installed. Utilities typically enter into contracts with appliance replacement providers, such as ARCA, to carry out this program.

40.  In California, ARCA supplies and recycles ENERGY STAR appliances for low income individuals in the Los Angeles area, primary through its contracts with the Southern California Public Power Authority ("SCPPA") and SCPPA's participating members, including the Los Angeles Department of Water and Power ("LADWP").

41.  California was not the only state in which ARCA provided appliance replacement services for low income households. According to ARCA's SEC filings and CW1, ARCA provided such services in several other states, including Texas, Washington, and Minnesota.

42.  Appliance recycling (including appliance replacement) is a major and vital part of ARCA's business. For example, in 2013, it accounted for 32% of ARCA's total revenue, and in 2014, it accounted for 35% of ARCA's total revenue. Moreover, as of March 1, 2015, 42% of ARCA's 349 employees work in the appliance recycling segment of its business.

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

43.     Incorporated in 1983, ARCA is a sophisticated company with decades of business experience and generates more than a hundred million dollars each year in revenue (e.g. $130 million in 2014 and $128 million in 2013).

**California Sales Tax**

44.     Under Section 6051 of the California Revenue and Taxation Code, California imposes a sales tax on retailers "for the privilege of selling tangible personal property" unless exempted by state law. Section 6016 of the California Revenue and Taxation Code defines tangible personal property as "personal property which may be seen, weighed, measured, felt, or touched, or which is in any other manner perceptible to the senses." Generally, nonprofits, public agencies, and charities are subject to sales tax, unless otherwise exempted.

45.     Exemptions from sales tax are listed in detail in Sections 6351-6423 of the California Revenue and Taxation Code.

46.     Appliances purchased by public utilities provided to low-income participants as part of an energy efficiency program are not listed as an exemption, and are therefore not exempt from sales tax under the California Revenue and Taxation Code.

47.     The BOE also has a FAQ section on its website that addresses sales tax exemptions.  That FAQ section states that if an exemption does apply, the seller in good faith should obtain valid exemption certificates from the purchaser before invoicing the customer.  The FAQ section can be accessed at http://www.boe.ca.gov/sutax/faq426.htm.

48.     According to the Wayback Machine, an internet archive that maintains snapshots of websites on particulate dates, the BOE's FAQ website, and the language addressing exemption certificates, existed throughout the Class Period in the same form as is now available on the California BOE website today.

**ARCA's False and Misleading Statements Issued during the Class Period**

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

49.    The Class Period starts on March 15, 2012, when the Company filed a Form 10-K for the fiscal year ended December 31, 2011 (the "2011 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of December 31, 2011. The 2011 10-K was signed by Defendant Cameron. The 2011 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendant Cameron, which stated that the financial information contained in the 2011 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

50.    On March 22, 2013, the Company filed a Form 10-K for the fiscal year ended December 29, 2012 (the "2012 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of December 29, 2012. The 2012 10-K was signed by Defendants Cameron and Cammerrer. The 2012 10-K contained signed SOX certifications by Defendants Cameron and Cammerrer, which stated that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

51.    On May 9, 2013, the Company filed a Form 10-Q for the quarterly period ended March 30, 2013 (the "1Q2013 10-Q") with the SEC, which provided the Company's quarterly financial results and position and stated that there was no change in the Company's internal control over financial reporting during the quarter. The 1Q2013 10-Q was signed by Defendants Cameron and Cammerrer. The 1Q2013 10-Q contained signed SOX certifications by Defendants Cameron and Cammerrer, which stated that the financial information contained in the 1Q2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

52.     The 1Q2013 10-Q was false and misleading for failure to account for sales taxes payable in California and therefore overstated operating and net income as follows:

Quarter Ended March 30, 2013

| | Reported | Restated | Amount Overstated | % Overstated |
|---|---|---|---|---|
| Operating Income (thousands) | $425 | $145 | $280.0 | 193.10% |
| Net Income (thousands) | $129 | ($162) | $291.0 | 179.63% |
| Income Per Share: Basic | $0.03 | ($0.02) | $0.05 | 250.00% |
| Income Per Share: Diluted | $0.03 | ($0.02) | $0.05 | 250.00% |

53.     Defendants' misstatements turned a quarterly loss into a profit.

54.     On August 8, 2014, the Company filed a Form 10-Q for the quarterly period ended June 29, 2013 (the "2Q2013 10-Q") with the SEC, which provided the Company's quarterly financial results and position and stated that there was no change in the Company's internal control over financial reporting during the quarter. The 2Q2013 10-Q was signed by Defendants Cameron and Cammerrer. The 2Q2013 10-Q contained signed SOX certifications by Defendants Cameron and Cammerrer, which stated that the financial information contained in the 2Q2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

55.     The 2Q2013 10-Q was false and misleading for failure to account for sales taxes payable in California and therefore overstated operating income, net income and earnings per share in material amounts as follows:

Quarter Ended June 29, 2013

| | Reported | Restated | Amount Overstated | % Overstated |
|---|---|---|---|---|
| Operating Income (thousands) | $1,200 | $881 | $319 | 36.2% |

- 12 -

| | | | |
|---|---|---|---|
| Net Income (thousands) | $726 | $394 | $332 | 84.3% |
| Income Per Share: Basic | $0.14 | $0.08 | $0.06 | 75.0% |
| Income Per Share: Diluted | $0.13 | $0.08 | $0.05 | 62.5% |

56.     On November 7, 2013, the Company filed a Form 10-Q for the quarterly period ended September 28, 2013 (the "3Q2013 10-Q") with the SEC, which provided the Company's quarterly financial results and position and stated that there was no change in the Company's internal control over financial reporting during the quarter. The 3Q2013 10-Q was signed by Defendants Cammerrer and Cameron.  The 3Q2013 10-Q contained signed SOX certifications by Defendants Cammerrer Cameron, which stated that the financial information contained in the 3Q2013 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

57.     The 3Q2013 10-Q was false and misleading for failure to account for sales taxes payable in California and overstated operating income, net income and earnings per share in material amounts as follows:

Quarter Ended September 28, 2013

| | | | Amount | |
|---|---|---|---|---|
| | Reported | Restated | Overstated | % Overstated |
| Operating Income (thousands) | $1,802 | $1,502 | $300 | 20.0% |
| Net Income (thousands) | $1,262 | $946 | $316 | 33.4% |
| Income Per Share: Basic | $0.20 | $0.15 | $0.05 | 33.3% |
| Income Per Share: Diluted | $0.20 | $0.14 | $0.06 | 42.9% |

58.     On March 14, 2014, the Company filed a Form 10-K for the fiscal year ended December 28, 2013 (the "2013 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting was effective as of December 28, 2013. The

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

2013 10-K was signed by Defendants Cameron and Cammerrer. The 2013 10-K contained signed SOX certifications by Defendants Cameron and Cammerrer, which stated that the financial information contained in the 2012 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

59.    The 2013 10-K was false and misleading for failure to account for sales taxes payable in California and therefore overstated operating income, net income and earnings per share in material amounts as follows:

Year Ended December 28, 2013

|  | Reported | Restated | Amount Overstated | % Overstated |
|---|---|---|---|---|
| Operating Income (thousands) | $4,579 | $3,396 | $1,183 | 34.8% |
| Net Income (thousands) | $3,633 | $3,462 | $171 | 4.9% |
| Income Per Share: Basic | $0.60 | $0.57 | $0.03 | 5.3% |
| Income Per Share: Diluted | $0.58 | $0.55 | $0.03 | 5.5% |

60.    On May 9, 2014, the Company filed a Form 10-Q for the quarterly period ended March 29, 2014 (the "1Q2014 10-Q") with the SEC, which provided the Company's quarterly financial results and position and stated that there was no change in the Company's internal control over financial reporting during the quarter. The 1Q2014 10-Q was signed by Defendants Cameron and Cammerrer. The 1Q2014 10-Q contained signed SOX certifications by Defendants Cameron and Cammerrer, which stated that the financial information contained in the 1Q2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

61.    The 1Q2014 10-Q was false and misleading for failure to account for sales taxes payable in California and overstated operating income, net income and earnings per share in material amounts as follows:

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

Quarter Ended March 29, 2014

| | Reported | Restated | Amount Overstated | % Overstated |
|---|---|---|---|---|
| Operating Income (thousands) | $2,070 | $1,686 | $384 | 22.7% |
| Net Income (thousands) | $1,108 | $865 | $243 | 28.0% |
| Income Per Share: Basic | $0.17 | $0.13 | $0.04 | 30.8% |
| Income Per Share: Diluted | $0.17 | $0.12 | $0.05 | 41.7% |

62.    On August 11, 2014, the Company filed a Form 10-Q for the quarterly period ended June 28, 2014 (the "2Q2014 10-Q") with the SEC, which provided the Company's quarterly financial results and position and stated that there was no change in the Company's internal control over financial reporting during the quarter. The 2Q2014 10-Q was signed by Defendants Cameron and Cammerrer. The 2Q2014 10-Q contained signed SOX certifications by Defendants Cameron and Cammerrer, which stated that the financial information contained in the 2Q2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

63.    The 2Q2014 10-Q was false and misleading for failure to account for sales taxes payable in California and overstated operating income, net income and earnings per share in material amounts as follows:

Quarter Ended June 28, 2014

| | Reported | Restated | Amount Overstated | % Overstated |
|---|---|---|---|---|
| Operating Income (thousands) | $1,208 | $830 | $378 | 45.5% |
| Net Income (thousands) | $584 | $343 | $241 | 70.3% |
| Income Per Share: Basic | $0.11 | $0.06 | $0.05 | 83.3% |
| Income Per Share: Diluted | $0.10 | $0.06 | $0.04 | 66.7% |

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

64.     On November 7, 2014, the Company filed a Form 10-Q for the quarterly period ended September 27, 2014 (the "3Q2014 10-Q") with the SEC, which provided the Company's quarterly financial results and position and stated that there was no change in the Company's internal control over financial reporting during the quarter. The 3Q2014 10-Q was signed by Defendant Cammerrer.  The 3Q2014 10-Q contained a signed SOX certification by Defendant Cammerrer, which stated that the financial information contained in the 3Q2014 10-Q was accurate and disclosed any material changes to the Company's internal control over financial reporting.

65.     The 3Q2014 10-Q was false and misleading for failure to account for sales taxes payable in California and overstated operating income in a material amount as follows:

Quarter Ended September 27, 2014

|  | Reported | Restated | Amount Overstated | % Overstated |
|---|---|---|---|---|
| Operating Income (thousands) | $1,083 | $678 | $405 | 59.7% |

66.     The statements referenced in ¶¶ 49-65 above were materially false and/or misleading because they misrepresented and failed to disclose that: (1) ARCA's financial statements failed to include up to $3.9 million of sales tax expense and tax liabilities and therefore contained material errors in its income statements and balance sheets; (2) the Company lacked adequate internal controls over its financial reporting; and (3) as a result of the foregoing, the Company's financial statements were materially false and misleading at all relevant times.

**The Truth Slowly Emerges**

67.     On August 6, 2014, the Company issued a press release announcing its financial results for the second quarter ended June 28, 2014. In the same press

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

release, the Company revealed the BOE was conducting a sales and use tax examination of its California operations from 2011 to 2013, stating in relevant part:

> From time to time, the company is subject to sales and use tax audits that could result in additional taxes, penalties and interest owed to various taxing authorities. ***The California Board of Equalization is currently conducting a sales and use tax examination covering the company's California operations for 2011, 2012 and 2013. A large portion of the California operations in those years consisted of appliance replacement sales under programs conducted by utility companies on which the company did not assess, collect or remit sales tax.*** For several reasons, including the fact that these appliance replacement programs benefit low-income utility customers with ratepayer funds, ***the company believes such transactions could be exempt from taxation.*** It is possible that the California Board of Equalization will disagree with the company's position and assess taxes, penalties and interest in an amount that is material to its financial position and results of operations. The company intends to vigorously advance and defend its position in cooperation with local utilities and governmental regulatory entities should taxes, penalties and interest be assessed by the California Board of Equalization.  At this time, the company cannot estimate a range of potential impact on its consolidated financial statements.

(Emphasis added).

68.     On this news, the Company's shares fell $1.11 per share or over 27% to close at $2.99 per share on August 7, 2014, damaging investors.

69.     On February 11, 2015, the Company issued a press release announcing, among other things, that: (i) it anticipates a $4.0 million assessment from the BOE for failure to collect and remit sales tax; and (ii) its previously issued unaudited consolidated financial statement for the fiscal quarters ended March 29, June 28 and September 27, 2014 and consolidated financial statements for the years ended December 28, 2013, December 29, 2012 and December 31, 2011 and the quarters in the years then ended should no longer be relied upon and will need to be restated. The press release states, in part:

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

MINNEAPOLIS, Feb. 11, 2015 /PRNewswire/ -- ***Appliance Recycling Centers of America, Inc. ("ARCA" or the "Company") reported that it has applied for and, as of February 9, 2015, received approval from the California Board of Equalization ("BOE") to participate in the BOE's Managed Audit Program, which allows ARCA to conduct a self-examination related to state sales and use taxes.*** As the Company communicated previously, the BOE had notified the Company of its intent to conduct an examination of sales and use taxes covering ARCA's appliance replacement sales in California during 2011-2013. ***During the fourth quarter of 2014, the Company received communication from the BOE indicating that they were not in agreement with the Company's interpretation of the sales tax law in the State of California.*** The Company then contacted its utility company clients requesting evidence of tax exemption. The utility companies did not respond to the Company's requests. On February 6, 2015, the Company's Board Chairman and its Chief Executive Officer met with representatives of the utility company for which the majority of the sales taxes relate.  The utility company representatives stated that to their knowledge they had no evidence of tax exemption to provide the Company. They said that they would, however, research whether funding for any of the appliance replacements came from federal sources, which could potentially help support partial tax exemption. ARCA's participation in the BOE's Managed Audit Program could result in the elimination of potential tax penalties while significantly reducing interest costs associated with any tax assessment. The Managed Audit will cover the period from January 1, 2011 through September 30, 2014, and is expected to be completed by March 31, 2015.

* * * * *

***The Company believes that the outcome from the Managed Audit Program will likely result in a Notice of Determination from the California BOE of an assessment of at least $4.0 million ($2.6 million net of income taxes), covering the entire period under audit.*** The Company has been working with outside consultants to arrive at our assessment estimate and will continue to engage the services of these sales tax experts throughout the Managed Audit Program process. Such

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

assessment, however, would be subject to protest and appeal, and would not need to be funded until the matter has been fully resolved. Resolution could take up to three years. ***The Company anticipates that a pre-tax charge to earnings will be required and that previously issued unaudited consolidated financial statement for the fiscal quarters ended March 29, June 28 and September 27, 2014 and consolidated financial statements for the years ended December 28, 2013, December 29, 2012 and December 31, 2011 and the quarters in the years then ended will need to be restated.  Such previously issued consolidated financial statements should no longer be relied upon[.]***

(Emphasis added).

70.    On February 12, 2015, the Company filed a Form 8-K with the SEC, which further detailed the non-reliance of its previously issued financial statements. The Form 8-K states, in part:

**Item 4.02. Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review.**

As previously disclosed, the California Board of Equalization ("BOE") is conducting a sales and use tax examination covering the California operations of Appliance Recycling Centers of America, Inc. (the "Company") for 2011, 2012 and 2013. The Company believed it was exempt from collecting sales taxes under service agreements with utility customers which included appliance replacement programs. During the fourth quarter of 2014 the Company received communication from the BOE indicating that they are not in agreement with the Company's interpretation of the law. As a result, the Company has applied for and, as of February 9, 2015, received approval to participate in the California Board of Equalization's Managed Audit Program. The period covered under this program includes 2011, 2012, 2013 and extends through the nine-month period ended September 30, 2014. ***At this time, it is our belief that the Company will be assessed at least $4.0 million ($2.6 million net of income taxes) in sales tax and interest related to the appliance replacement programs that we administered on behalf of our customers on which we did not assess, collect or remit sales tax.*** The Company has been working with outside consultants to arrive at our

- 19 -

assessment estimate and will continue to engage the services of these sales tax experts throughout the Managed Audit Program process. The sales tax amounts that we will likely be assessed relate to transactions in the period under examination by the BOE. Such assessment, however, would be subject to protest and appeal, and would not need to be funded until the matter has been fully resolved. Resolution could take up to three years. The Company's failure to collect and remit taxes related to the prior periods is estimated to be material to the results previously reported by the Company for all periods under examination by the BOE. The Company is working with the Audit Committee of the Company's Board of Directors (the "Audit Committee") and the Company's advisors to determine the final adjustments required to be made to the prior financial information as expeditiously as possible.

***On February 9, 2015, the Audit Committee, after discussion with management and the Company's independent registered public accounting firm, Baker Tilly Virchow Krause LLP ("BTVK"), concluded that the Company's previously issued audited consolidated financial statements for the years ended December 28, 2013, December 29, 2012 and December 31, 2011 and the previously issued unaudited consolidated financial statements for the fiscal quarters ended March 29, June 28, and September 27, 2014, and also including 2013, 2012 and 2011 quarterly results and the disclosures and related communications for each of those periods, require the correction of amounts previously reported and should no longer be relied upon. Also, management's report on internal controls over financial reporting for the year ended December 28, 2013 should no longer be relied upon.***

The Company anticipates that it will file its Annual Report on Form 10-K for the fiscal year ended January 3, 2015 (the "2014 10-K") on a timely basis. ***The Company will restate the financial results contained in the Company's Annual Report on Form 10-K for the fiscal year ended December 28, 2013 and the previously unaudited financial statements and other financial information contained in the Company's Quarterly Reports on Form 10-Q for the fiscal quarters ended March 29, June 28, and September 27, 2014, along with the disclosures and related communications for these periods.*** The Audit

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

Committee and the Company presently do not expect to identify any material adjustments in the restated financial statements other than the sales tax matter discussed above.

The Company and the Audit Committee are reevaluating the Company's internal control over financial reporting and its disclosure controls and procedures. Management, in consultation with the Audit Committee, also has determined that material weaknesses existed in the Company's internal control over financial reporting and that disclosure controls and procedures were not effective at December 28, 2013 and through January 3, 2015. The Company intends to enhance its procedures and controls surrounding the accounting for sales and use taxes.

(Emphasis added).

71.     On this news, the Company's shares fell $0.43 per share or over 14% to close at $2.54 per share on February 12, 2015.

**Defendants' Failure to Collect and Pay Sales Tax was Fraudulent or at Least Highly Reckless**

72.     Confidential Witness 1[2] ("CW1") was a Senior Accountant for ARCA in its Minneapolis office from 2008 to 2012.  CW1 reported directly to Defendant Cammerrer.

73.     CW1 told Plaintiffs' investigator that she believed ARCA assessed, collected, and remitted sales tax for its appliance replacement programs for all of the states in which ARCA offered energy efficient appliance replacement services to low income customers.

74.     In particular, CW1 is sure that ARCA collected and paid sales tax in Washington for ARCA's appliance replacement program for low income households. She is certain because she visited the state regularly as part of her work. Additionally,

---

[2]   Plaintiffs are not including the "confidential witnesses" real names to protect their privacy and avoid retribution.  Plaintiffs will provide Defendants the names of the confidential witnesses immediately upon Defendants' execution of an acceptable confidentiality stipulation and protective order.

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

she told Plaintiffs' investigator that "I remember because there was a problem with a bunch of the [replacement] units once and a lot of work had to be redone.  That program was collecting tax, and it was such a pain because Washington went by state, city and county."

75.    CW1 stated: "I know we collected [sales] taxes because I put in the figures."  CW1 added: "I had to update tax tables and I assume on everything across the board we were collecting [sales] tax. I collected the [sales] tax tables from the website and brought them into our system – we used in-house, homebrewed accounting software – and loaded them into the tables."

76.    CW1 did this for the state of Washington, she said, visiting the state quarterly. CW1 believed sales tax was being paid in all the states where ARCA offered energy efficient appliances to low-income customers.

77.    CW1 stated that invoices for appliance replacement sales that she saw all had a separate line item for sales tax.

78.    "[T]hey were always making sure we had documentation, the state sales tax auditors came in whenever," CW1 said.

79.    CW1 recalls sales tax auditors from Minnesota, Texas and Georgia showing up unannounced during her tenure.  This is confirmed by ARCA's public statement on August 6, 2014 that "[f]rom time to time, the company is subject to sales and use tax audits that could result in additional taxes, penalties and interest owed to various taxing authorities."

80.    According to CW1, ARCA knew about exemption certificates and understood that exemptions from sales tax needed to be supported by exemption certificates.  CW1 recalls ARCA's top executives saying that sales tax exemption would apply if the Company was "doing something for a charity with an exemption certificate." And even so, "we had to check the certificate, to make sure that they were exempt from it."  CW1 stated that ARCA's company-wide policy was to ensure

- 22 -

1  that an exemption certificate was obtained from any customers that did not pay sales

2  tax.

3    81.   CW1 said she and the rest of the accounting team were under the

4  impression that the company had to pay sales taxes for appliance replacement sales in

5  in all the states where it operated.

6    82.   CW1 also said that Defendant Cammerrer had ultimate responsibility

7  over payment of sales taxes, and that Cammerrer had to sign off on everything in

8  accounting and finance, including but not limited to the payment of sales taxes.

9    83.   CW2, a Senior Auditor and SOX Specialist in ARCA's Minneapolis

10  office from February 2009 to September 2012, corroborated CW1's claim that the

11  CFO (i.e. Cammerrer) handled tax payments for the Company.

12    84.   Because ARCA knew to pay, and did pay, sales tax in other states where

13  it provided appliance replacement services, such as in Washington, and knew to

14  check exemption certificates in those states, ARCA's selective failure to do so in

15  California indicated that it was an intentional decision.

16    85.   Indeed, by not collecting sales tax from its customers, ARCA was able

17  to win competitive bids in California that appeared cheaper than they would have

18  been had ARCA's bids included the additional cost of sales tax.   ARCA's annual

19  report for the fiscal year ended January 3, 2015 explained that one of the main

20  strategies that its competitors use to compete against ARCA is lower pricing.  By not

21  charging sales tax, ARCA was able to reduce the price it charged its customers by at

22  least 9.0%, which is the minimum sales tax for Los Angeles County where ARCA

23  conducted the bulk of its business in California.

24    86.   While ARCA's failure to pay sales tax in California appears to be a

25  deliberate fraud, even if it wasn't intentional, it at least represented highly reckless

26  conduct.   As a sophisticated Company with hundreds of employees, decades of

27  experience, and hundreds of millions in revenue each year, it is befuddling and

28

- 23 -

inexcusable that ARCA never bothered to verify or comprehend the California tax laws.

87. On February 6, 2015 the Company issued a press release that stated in part:

> "During the fourth quarter of 2014, the Company received communication from the BOE indicating that they were not in agreement with the Company's interpretation of the sales tax law in the State of California. The Company then contacted its utility company clients requesting evidence of tax exemption. The utility companies did not respond to the Company's requests. On February 6, 2015, the Company's Board Chairman and its Chief Executive Officer met with representatives of the utility company for which the majority of the sales taxes relate. The utility company representatives stated that to their knowledge they had no evidence of tax exemption to provide the Company.

88. Consistent with ARCA's announcement in the preceding paragraph, a director at the Southern California Public Power Authority (the "SCPPA Director") stated to Plaintiffs' investigator that ARCA executives contacted him about the BOE audit, and claimed that ARCA was under the impression that it did not need to charge sales tax because the appliance replacement program was "publicly funded."  The SCPPA Director explained that ARCA's interpretation was one that he personally had never heard of, and was not common.

89. Cameron and Cammerrer's scienter is further evidenced by their false exculpatory statement in ARCA's August 6, 2014 press release that ARCA believed because "these appliance replacement programs benefit low-income utility customers with ratepayer funds, *the company believes such transactions could be exempt from taxation."*

90. ARCA collected sales tax in all other states in which its appliance replacement business operated.  And it had a strict company-wide policy to obtain the exemption certificates from the customers when sales tax was not collected.

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

91.    The CA BOE regulations that were available on the BOE website at all times during the Class Period state that the seller should in good faith obtain timely and valid exemption certificates from the purchaser before invoicing the customer.

92.    Here, Cameron and Cammerrer did not attempt to obtain the exemption certificate until the BOE auditors had assessed ARCA for the unpaid tax on its California appliance replacement sales and Defendants knew they had no reasonable basis to state that they believed the appliance replacement sales were exempt from sales tax in California because they had been collecting sales tax for such sales in other states and has a strict policy to obtain exemption certificates for all customers who did not pay sales tax.

93.    Cameron and Cammerrer had authority over and controlled the content of the false exculpatory statement in ARCA's August 6, 2014 press release.

94.    Other companies that provide appliance replacement services in California were aware that they had to pay sales tax.  City Appliance & Sales, a company that provides appliance replacement for Lompoc's low-income energy program, told Plaintiffs' investigator that they do charge sales tax on all replacement units distributed as part of its appliance replacement program.

95.    Indeed, all ARCA had to do was review the sales tax exemptions listed in §§ 6351–6423 of the California Revenue and Taxation Code to see that there is no sales tax exemption for appliances purchased by public utilities.

96.    On August 13, 2014, barely a week after the Company revealed that it was being audited by the BOE for sales tax violations, Defendant Cameron abruptly retired as ARCA's president and CEO.

97.    On November 3, 2014, less than three months after the Company revealed that it was being audited by the BOE for sales tax violations, ARCA announced Defendant Cammerrer's resignation as CFO, effective November 21, 2014.  Cammerrer left to take another CFO position at DMS Health Technologies, a

- 25 -

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

privately held firm, which was a much less prestigious position, indicating that he was forced out of his job at ARCA.

98. By January 3, 2015, less than half a year after the fraud came to light and just prior to ARCA's announcement that it expected to be assessed $4.0 million in unpaid taxes and would restate its financial statements, it was revealed that three of the four members of ARCA's board of directors (i.e. Steve Lowenthal, Randy Pearce, and Dean Pickerell) were resigning.  On the Schedule 14A that ARCA filed with the SEC on January 3, 2015, four new board members were nominated to replace the three outgoing board members.

99. The sudden departure of CEO Cameron and CFO Cammerrer, the Company's two top executives, and the mass resignation of ARCA's board of directors in the wake of the sales tax scandal provide strong indication that ARCA's violation was not just an innocent oversight.  The mistake was so serious and unforgivable that ARCA decided to "clean house" and terminate both Cameron and Cammerrer.

**ARCA's Post-Class Period Disclosures**

100. On May 18, 2015, ARCA filed a Form 10-K/A with the SEC in which it restated each of its financial statements for the quarterly and annual periods from first quarter 2013 through third quarter 2014.

101. As part of the restatement, ARCA stated that it expects to be assessed a $3.9 million in unpaid sales taxes during the period of 2011 to September 2014. Further, it disclosed that "management's report on internal controls over financial reporting for the year ended December 28, 2013 should no longer be relied upon." ARCA then assessed its internal controls over financial reporting as "not effective" as of January 3, 2015.

<u>**ARCA'S FINANCIAL STATEMENTS WERE FALSE AND MISLEADING BECAUSE THEY VIOLATED GAAP**</u>

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

102.   GAAP constitutes those standards recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.

103.   GAAP is the common set of accounting principles, standards, and procedures that companies in the United States use to compile their financial statements.

104.   The SEC has the statutory authority for the promulgation of GAAP for public companies and has delegated that authority to the Financial Accounting Standards Board (the "FASB").

105.   SEC and NASDAQ rules and regulations require that publicly traded companies such as Montage include financial statements that comply with GAAP in their annual and quarterly reports filed with the SEC. *See* Sections 12 and 13 of the Exchange Act; Rule 10-01(d) of Regulation SX.

106.   SEC Rule 4-01(a) of Regulation S-X states that "[f]inancial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1) (emphasis added).

107.   Management retains responsibility for preparing financial statements that conform with GAAP. The American Institute of Certified Public Accountants ("AICPA") Professional Standards provide:

> The financial statements are management's responsibility . . . Management is responsible for adopting sound accounting policies and for establishing and maintaining internal controls that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities, and equity are within the direct knowledge and control of management. . . . Thus, the fair presentation of financial statements in conformity with generally accepted

- 27 -

accounting principles is an implicit and integral part of management's responsibility.

AIPCA, Professional Standards, vol. 1, AU § 110.02 (1998).

**The Restatement**

108.   On May 18, 2015, ARCA filed an amended 10-K annual report for fiscal year 2014.  The form 10-K contained restated financial statements for fiscal years 2013 and for each quarterly period for 2013 and the first 9 months of 2014 (the "Restatement").

109.   Restatements are required for material accounting errors that existed at the time financial statements were prepared.  See SFAS 154.

110.   An accounting "error" is a term of art and results from, among other things, an error in recognition, measurement, or mistakes in the application of GAAP. SFAS 154.

111.   Under SFAS 154, errors result from (i) mathematical mistakes, (ii) mistakes in application of GAAP, or (iii) oversight or misuse of facts that existed at the time the financial statements were prepared.

112.   By issuing the Restatement, ARCA acknowledged that its financial statements for the restated periods were materially inaccurate, and did not comply with GAAP and were therefore false and misleading. 17 C.F.R. § 210.4-01(a)(1)

113.   With respect to ARCA the restated items were quantitatively material to its financial statements as set forth above.

**Defendants are Knowledgeable of GAAP**

114.   There is no question that the Company's CFO, Defendant Cammerrer, was intimately knowledgeable of sales tax requirements.  He served as Vice President of Accounting and Finance from March 2012 until his appointment as Chief Financial Officer, and had previously served as Corporate Controller since July 2008. Mr. Cammerrer directed the Company's finance and accounting functions, including financial planning and reporting. He also managed all of the Company's day-to-day

- 28 -

accounting operations, including treasury, taxes, billing, collections and accounts payable. Mr. Cammerrer held the position of director of finance for Milestone AV Technologies from September 2007 through July 2008. He also held several accounting management positions, including vice president of accounting, at Eschelon Telecom, Inc. from March 1997 through September 2007. He is also a CPA (inactive).

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

115.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired ARCA common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

116.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ARCA common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by ARCA or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

117.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

Second Amended Class Action Complaint for Violation of the Federal Securities Laws

118.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

119.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of ARCA;

- whether the Individual Defendants caused ARCA to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of ARCA common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

120.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

- 30 -

121.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- ARCA common stock are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiffs and members of the Class purchased, acquired and/or sold ARCA common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

122.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

123.    Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

**Violations of Section 10(b) of The Exchange Act and Rule 10b-5**
**Against All Defendants**

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

124.   Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

125.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

126.   During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of common stock. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ARCA securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire ARCA common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

127.   Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for ARCA common stock. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about ARCA's finances and business prospects.

128.   By virtue of their positions at ARCA, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

129.   Cammerrer's and Cameron's knowledge, as well as the knowledge the ARCA controller is imputed to ARCA under the doctrine of *respondeat superior.*

130.   Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the sale of ARCA common stock from their personal portfolios.

131.   Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of ARCA, the Individual Defendants had knowledge of the details of ARCA's internal affairs.

132.   The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of ARCA. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to ARCA's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the aforementioned false and

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

misleading reports, releases and public statements, the market price of ARCA common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning ARCA's business and financial condition which were concealed by Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired ARCA common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock and/or upon statements disseminated by Defendants, and were damaged thereby.

133.   During the Class Period, ARCA common stock were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of ARCA common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of ARCA common stock was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of ARCA common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

134.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

135.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's common stock

- 34 -

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

136.   Plaintiffs' complaint was filed within two years of discovery of the misleading statements and within five years of their purchases of ARCA securities.

## COUNT II

### Violations of Section 20(a) of The Exchange Act
### <u>Against The Individual Defendants</u>

137.   Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

138.   During the Class Period, the Individual Defendants participated in the operation and management of ARCA, and conducted and participated, directly and indirectly, in the conduct of ARCA's business affairs. Because of their senior positions, they knew the adverse non-public information about ARCA's current financial position and future business prospects.

139.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to ARCA's business practices, and to correct promptly any public statements issued by ARCA which had become materially false or misleading.

140.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which ARCA disseminated in the marketplace during the Class Period concerning the Company's business, operational and accounting policies. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause ARCA to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of ARCA within the meaning of Section 20(a) of the Exchange Act. In this

- 35 -

capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of ARCA common stock.

141.   Each of the Individual Defendants, therefore, acted as a controlling person of ARCA. By reason of their senior management positions and/or being directors of ARCA, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, ARCA to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of ARCA and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

142.   By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by ARCA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demands judgment against Defendants as follows:

A.   Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.   Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.   Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as her reasonable attorneys' fees, expert fees and other costs; and

D.   Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

- 36 -

Dated: December 15, 2015

Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence Rosen
Laurence M. Rosen, Esq. (SBN 219683)
355 S. Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

Yu Shi, Esq. (*Pro Hac Vice*)
275 Madison Ave, 34th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile: (212) 202-3827
Email: yshi@rosenlegal.com

Counsel for Lead Plaintiffs

- 37 -

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws

## CERTIFICATE OF SERVICE

I, Laurence Rosen, hereby declare under penalty of perjury as follows:

I am attorney with the Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA, 90071. I am over the age of eighteen.

On December 15, 2015, I electronically filed the foregoing SECOND AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to counsel of record.

Executed on December 15, 2015

/s/ Laurence Rosen
Laurence Rosen

Second Amended Class Action Complaint for Violation of the
Federal Securities Laws